KENNETH M. HENSON AND SUE B. HENSON, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Henson v. Commissioner
Docket No. 31654-83.
United States Tax Court
T.C. Memo 1986-303; 1986 Tax Ct. Memo LEXIS 300; 51 T.C.M. (CCH) 1476; T.C.M. (RIA) 86303; July 23, 1986. *300 Held: Disallowance of loss deduction and additions to tax for fraud sustained against Husband, a practicing lawyer, based upon falsely claiming a capital loss from a fictitious sale of stock. Other issues determined. James C. Fleming and Bryan B. Lavine, for the petitioners. Charles P. Honfman, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies and additions to tax for the years and the amounts indicated: Additions to Tax
Years
Deficiency
Section 6653(b) [1]
1974
$59,715.11
$29,857.55
1975
12,329.05
6,164.52
1976
28,755.03
14,377.51 After concessions, the principal issue in this case is whether petitioner Kenneth M. Henson (Henson) is liable for additions to tax under section 6653(b) for fraud. [2] The fraud additions are predicated upon respondent's contention that: for 1974 a sale of stock treated by Henson as a capital loss was a sham; for 1975 there was a failure to report for tax purposes a dividend in the amount of $2,356.56 from American Family Corporation (American Family); and for 1976 there was a failure to report a receipt of certain funds from Gasoil Products, Inc. (Gasoil) as taxable under the tax benefit rule. Also *301 in issue are deficiencies in each year unless barred by the statute of limitations. Unless respondent's determination as to the fraud additions is sustained for the years 1974 and 1975, those years will be barred by the statute of limitations. With respect to 1976, respondent has an alternative contention with respect to the statute of limitations -- that the year is open under section 6501(e). FINDINGS OF FACT Some of the facts have been stipulated and they are so found. At the time the petition in this case was filed, petitioners were residents of Columbus, Georgia. Petitioners filed joint Federal income tax returns for each of the years 1973 through 1976, reporting their income and expenses on the cash method of accounting. Each of these tax returns was prepared by an independent accountant. *302 Henson is, and for many years has been, a lawyer engaged in private practice specializing in litigation with offices in Columbus, Georgia. Henson has some degree of familiarity with the law of Federal income taxation. During the period involved, he was aware of the distinction between ordinary income and capital gains and the basic elements of a wash sale under section 1091(a), including the 30-day period. Gasoil Transaction
On October 30, 1973, petitioner made an investment in Gasoil pursuant to which he acquired a 5-percent interest in certain oil and gas leases in St. Mary's Parish, Louisiana. [3] *304 Gasoil was obligated to drill a minimum of five wells, two wells to be drilled in 1973. The contract also provided reimbursement to Henson if less than five wells were drilled, the repayment or reimbursement being at the rate of $25,000 per failure to drill any of wells three, four, and five prior to the end of 1974. No provision was made for the drilling of only one well in 1973. Henson was also given the right to invest in subsequent wells. The purchase price for the oil and gas interest was $125,000. The amount of $25,000 was paid by check dated October 30, 1973. The $100,000 *303 balance was represented by two notes, each dated October 23, 1973, one in the amount of $25,000 due on December 30, 1973, and one in the amount of $75,000 due January 19, 1974. The purchase agreements allocated to Hensen $75,000 in intangible drilling and development costs for the year 1973 and $50,000 for 1974. The $75,000 note gave Henson the right to cancel that note and his participation in the third, fourth, and fifth wells in the event that sale by Henson of his common stock in an unrelated corporation was not consummated. The $25,000 note was conditioned simply upon the performance by Gasoil of its agreements with Henson. During December 1973, petitioner wrote two checks to Gasoil each in the amount of $25,000. Each check was post-dated to December 31, 1973. One check recites that it was intended as payment on the note due on December 30, 1973 and the other as part payment of the note due January 19, 1974. These two checks were mailed or otherwise delivered to a representative of Gasoil, Huel A. White, Jr. Neither check was deposited to the account of Gasoil in 1973. In the latter part of December 1973, Henson learned that only one well had been drilled which was a dry hole and that Gasoil was contemplating abandoning further drilling. Either in late December or in early January 1974 Henson requested that the checks be held by White undeposited until an amendment to the 1973 drilling agreement could be negotiated. By an amending instrument dated January 19, 1974, Henson was relieved of liability for payment of the two 1973 promissory notes. Gasoil issued to Henson its own interest-bearing note in the sum of $50,000, secured by a mortgage and assignment of the oil and gas leases. The $50,000 note was payable on the earlier of *305 30 days after demand or 2 years from its date. [4] *306 The two outstanding checks written by Henson in December 1973 were deposited by Gasoil on January 22, 1974. Although not entirely clear from the amended agreement, the sums represented by the two checks appear to have been loaned to Gasoil and are represented by Gasoil's note. At least the parties have so treated this 1974 transaction, and on that basis we so find. [5] Gasoil was relieved of further obligation to drill other wells, but if wells were drilled, Henson had an option to participate therein. Henson also had the right to direct investment of the $50,000 owed him by Gasoil in other wells or developments. By a separate instrument, he was given the right to market the St. Mary's Parish leases for a commission. During 1974 petitioner received some interest payments from Gasoil on the $50,000 obligation, which were reported on petitioner's income tax return as such. In 1975 and 1976, Henson received interest payments from Gasoil (or from White on Gasoil's behalf) in the respective amounts of $4,169 and $932.08, but these amounts were not reported by Henson for Federal income tax purposes in his tax returns for those 2 years. Instead, he treated these sums as payments of principal. In addition, during 1976 Henson received the sum of $42,667 from Gasoil. Henson treated this amount as repayment to him of the $50,000 loan. This sum of $42,607 was received in two checks, one dated March 4, 1976 in the amount of $17,667 and the other dated January 22, 1976 in the amount of $25,000. The March check has *307 endorsed upon it the legend "return of unused drilling funds Louisiana Prospects" and the January check " Return of drilling money." Both checks were endorsed to the order of Henson's law firm, the promissory note having been theretofore assigned to the law firm. The promissory note was marked paid and satisfied on March 11, 1976. [6] The $50,000 loan was a bona fide debt obligation of Gasoil to Henson made pursuant to the January 1974 amended agreement. [7]
American Family Stock Sale
American Family was organized in 1955 with Henson as one of the original subscribers. From time to time thereafter he purchased additional shares of stock. Some time prior to 1974 he became general counsel to the corporation. By December 11, 1974, Henson had accumulated at least 39,600 shares of American Family common stock. Prior to 1974, Henson had become a stockholder in several small *308 loan companies, including ALCO Finance, Inc. (ALCO). The president and chief executive officer of ALCO was Albert D. Long who owned 50 percent of the outstanding stock. The remaining stock was divided equally between Henson and George B. Smith. ALCO had been in business since 1968. During 1973 or early in 1974 there were discussions between Long, Henson, and others with respect to the desirability of expanding the business of ALCO through the acquisition of one or more other small loan companies. Such an acquisition would require the formation of a holding company, so that each small loan company could maintain an independent existence. It was recognized that Long, Henson, and Smith would have the same stock interest in such a holding company as they had in ALCO. Without direct authorization from Long, G. David Stapleton III (now deceased), a lawyer in Henson's law firm, prepared incorporation papers for a proposed holding company named Alco Industries, Inc. (Industries). Stapleton requested Long by telephone to visit his office to sign the incorporation papers, which Long did prior to June 7, 1974.During the telephone conversation or the office visit Long informed Stapleton *309 or Henson, or both, that expansion of ALCO was not feasible at that time and Long had no need for and did not want the new corporation. Long was advised that Henson wanted or could use the corporation. Hence, Long was willing to sign the documents. Industries was actually incorporated on June 10, 1974. [8] The incorporation papers show the sole incorporator to be Long, its initial board of directors to be Henson, Long, and Stapleton, and the initial registered office to be the office of Henson's law firm. The minutes of the organizational meeting of the directors of Industries are dated June 15, 1974, and are signed by Long, Henson, and Stapleton. The minutes are, however, incomplete in that paragraph 3, which is intended to designate the individuals elected to the several offices of the corporation, omits the names of the officers. A plan to offer section 1244 stock, purporting to *310 provide for 50 shares to be offered to Long and 25 shares each to Smith and Henson, is signed by Henson and Stapleton but not by Long. A certificate as to the corporate seal, signed by Stapleton, is dated June 15, 1974. The initial share subscription agreement is signed by Long, individually, and by him on behalf of Industries and recites that Long subscribed for 1,000 shares for the consideration of $1,000. An undated document signed by Long for the board of directors offers subscription rights to Messrs. Smith and Henson for 500 shares each. By document dated June 20, 1974, Henson and Stapleton resigned as officers and directors leaving Long as the sole member of the initial board of directors. Certificate Number 1 for 1,000 shares of Industry stock is dated June 15, 1974, and is signed by Long as president and Stapleton as secretary and shows Albert D. Long as the shareholder. The assignment printed on the back of this certificate is signed by Long in blank without a date inserted. [9]
Next in point of time is a corporate document styled Meeting of Directors of Industries dated *311 December 1, 1974 and signed by Long as president and director which recites that Industries was formed for the purpose of purchasing either Swift Loan and Finance Company or Swift Loan and Finance of Columbus, Inc. (referred to collectively as the Swift Loan Companies), that substantial corporate credit is needed to effect the purchase, and that Henson has expressed willingness to sell his shares of capital stock of American Family to Industries, which shares of stock would provide Industries with the needed credit. The record also includes a purported exchange of correspondence (discussed infra) between Henson and Long as president of Industries. There is a letter dated December 11, 1974 to Long from Henson which purports to confirm the sale by Henson of 39,276 shares of American Family stock to Industries for a total purchase price of $157,104. [10] The consideration is an unsecured promissory note of the same date in that amount signed by Long as president of Industries. Henson's letter recites that the American Family stock may be used by Industries to collateralize any loan procured to facilitate the purchase of either of the Swift Loan Companies or the assets of either. Henson *312 retained an option to repurchase the American Family stock after 30 days and up to 90 days from sale at the same price, provided an agreement for the acquisition of the assets or the stock of either of the Swift Loan Companies had not been made. Industries was also given the right to demand repurchase of the stock at the same price during that same period. The letter has endorsed on it an acknowledgment by Industries of the purchase, signed by Long on behalf of Industries. A second letter from Henson to Long as president of Industries, dated February 22, 1975, confirms a mutual agreement to repurchase the shares in view of the fact that Long has determined not to make any effort to purchase the stock or assets of either of the Swift Loan companies. This letter was also signed by Long as president of Industries. The note purportedly given by Industries to Henson dated December 11, 1974, to reflect the American Family stock purchase price has endorsed on it the words "Paid & surrendered 2/22/75 Kenneth M. Henson." The two letters from Henson to Long, the Industries note, and the December *313 1, 1974 minutes of Industries' directors were drafted by Henson rather than by Stapleton and were typed by Henson's secretary on or about the dates of the documents. All of the corporate papers pertaining to Industries remained in Henson's law office files until some time during the year 1976. In order to complete the purported sale of American Family stock to Industries, Henson personally delivered stock certificates for 39,600 shares to American Finance which reissued a new certificate for 39,276 shares in the name of ALCO Industries, Inc. This certificate is dated December 17, 1974 and was registered by Columbus Bank and Trust Company as registrar on December 18, 1974. The reissued certificate together with a certificate issued in Henson's name for 324 shares were delivered to Henson's office, on or shortly after December 18, 1974. A certificate for 39,276 shares retransferred to Henson was delivered to Henson shortly after May 12, 1975, which is the date on which it was processed for retransfer by American Family. American Family had no contact with Long or Industries except that, in March 1975, a dividend check in the amount of $2,356.56 was issued in the name of and mailed *314 to Industries at the address of ALCO.At Henson's request this check was endorsed by Long and delivered to Henson. [11]
Long remembers signing Industries' documents at the request of Stapleton on only two occasions, once during 1974 and once during 1975. On each occasion, Long went to Stapleton's office and signed whatever documents Stapleton requested without paying attention to their contents. The first occasion obviously took place prior to the date of incorporation and must have occurred in May or early June 1974. [12] The occasion of Long's second visit to Stapleton must have taken place prior to May 12, 1975, since that was the approximate date of the retransfer of the American Family shares to Henson on the books of American Family. We cannot be certain on what date or dates the execution of the documents relative to the alleged sale of American Family shares to Industries and the alleged repurchase occurred. We can only find that the execution of those documents by Long did not take place in December 1974. [13] The sale and repurchase documents may have been executed by Long prior to June 10, 1974, some time in 1975 but prior to May *315 12, 1975, or in part on the earlier date and in part on the later date. The purported sale of American Family stock to Industries was not mentioned or discussed by anyone with Long, and Long was not aware that it had taken place, until March 1975 when he received the American Family dividend check payable to Industries. Long was not aware of the December correspondence from Henson or the purported plan to use Henson's American Family stock as collateral for loans to provide funds to purchase the stock or assets of either of the Swift Loan Companies until shown the documents by respondent's agents. Long never agreed with Henson that he (Long) would in any capacity attempt in December 1974 or early 1975 to purchase the assets or stock of either loan company. Long was not able to effect such a purchase in whole or in part for his own account *316 and he did not participate in the organization of Industries in order to provide a vehicle for his efforts to effect such a purchase. No attempt was made by Long in December 1974 or in January or February 1975 to negotiate such a purchase with the owner of either loan company. Neither was any such attempt made by Henson. Long was not aware during 1974 or 1975 that on behalf of Industries he had signed either the December 11, 1974 or the February 22, 1975 letters and he did not affix his signature to the December 11, 1974 letter or the December Industries promissory note during December 1974. The purported sale by Henson of the American Family shares to Industries did not, in fact, take place. It was structured by Henson so that at all times control of the American Family shares remained with him and he was assured the ability to repurchase the shares at the alleged sale price. Industries had no business or other reason to purchase the American Family shares and did not do so. The sole objective of the purported transaction was Henson's desire to realize a substantial tax loss to offset a capital gain in excess of $200,000 realized by him on a sale of some stock in an unrelated *317 corporation which occurred on January 4, 1974. At the time Henson signed and filed or caused to be filed petitioners' 1974 Federal income tax return on which he claimed a long-term capital loss on the sale of 39,276 shares of American Family stock in the amount of $177,351.48, he knew that this sale had not taken place, that the documents purporting to reflect the sale were fictitious, and the sale transaction a sham. Section 6501(e) Facts
During the examination of petitioners' tax liabilities, respondent's agents issued several summonses to third-party recordkeepers as defined in section 7609(a)(3). Petitioners stayed compliance of those summonses. A proceeding to enforce summonses issued to the Columbus Bank and Trust Company and other entities (Civil Nos. 78-160-COL, 78-161-COL, 78-162-COL, and 78-163-COL) was commenced in the United States District Court for the Middle District of Georgia, Columbus Division, on October 11, 1978, and the summonses were ordered enforced 60 days thereafter on December 11, 1978. A proceeding to enforce a summons issued to the National Bank and Trust Company (Civil No. 79-29-COL) was commenced in the United States District Court for the Middle District *318 of Georgia, Columbus Division, on March 8, 1979, and was ordered dismissed 63 days thereafter on May 10, 1979. By letters, each dated March 20, 1979, to Hon. W. A. Bootle, United States District Judge and to Mr. Howell Hollis, attorney for the National Bank & Trust Company, petitioners' attorney withdrew petitioners' objection to the enforcement of the summons issued to the National Bank & Trust Company. That bank responded to the summons by letter dated April 2, 1979. OPINION With respect to each of the years 1974, 1975, and 1976 the normal statute of limitations had expired prior to the issuance of the statutory notice. As to the years 1974 and 1975, the only basis for finding the statute of limitations to be inapplicable would be a finding of fraud on the part of Henson. For 1976, in addition to fraud, respondent contends that section 6501(e) is applicable. Our focus is thus initially on whether or not fraud has been proven. [14] *319 Under section 6653(b) respondent has the burden of proof by clear and convincing evidence. Section 7454(a); Rule 142(b). To meet this burden, respondent must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner,80 T.C. 1111 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Estate of Pittard v. Commissioner,69 T.C. 391 (1977). Fraud is not to be imputed or presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970); Otsuki v. Commissioner,53 T.C. 96 (1969). However, fraud may be proven by circumstantial evidence because *320 direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,supra at 105-106 (1969). The intent to conceal or mislead may be inferred from the pattern of conduct. See Spies v. United States,317 U.S. 492, 499 (1943). But fraud may not be found under "circumstances which at most create only suspicion." Davis v. Commissioner,184 F.2d 86, 87 (10th Cir. 1950). Among the badges of fraud which may be taken into account are the making of false and inconsistent statements to revenue agents, Grosshandler v. Commissioner,75 T.C. 1, 20 (1980), and the filing of false documents, Stephenson v. Commissioner,79 T.C. 995, 1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984). The basis for fraud in 1974 is the reported sale, at a significant loss, of the American Family stock. The idea for the sale originated with Henson though whether it originated prior to the organization of Industries or thereafter, we cannot determine. Since it is respondent's burden of proof, we will give Henson the benefit of the doubt and assume *321 that the organization of Industries in June 1974 was motivated by Henson's hope of expanding the business of ALCO through the acquisition of the assets or stock of one of the two Swift Loan Companies which may have been available for sale. However, either he or Stapleton was told by Long, when Long was requested to sign the incorporation papers, that expansion of the ALCO business was not feasible at that time. If Henson did not participate in that conversation with Long, it is inconceivable that Stapleton did not so advise Henson. Thus, when Henson prepared the purported minutes of the directors' meeting of December 1, 1974, purporting to authorize the purchase of Henson's American Family shares of stock, and when Henson prepared the December 11, 1974, letter to Long, the promissory note of the same date, and the February 22, 1975, letter, he knew that Long was not interested in the proposal to expand ALCO's business by the acquisition of another loan company. Consequently, he knew ALCO had absolutely no reason to purchase Henson's American Family stock as collateral for prospective loans to finance such an expansion. Henson was sufficiently sophisticated in wash sales for Federal *322 tax purposes to understand the mechanics which would be necessary to realize a loss on the American Family stock and he obviously was sufficiently astute to structure and paper a transaction to make it appear real. We simply give no credit to Henson's testimony under oath with respect to this purported sale. [15] *323 Although Long's recollection of these matters was in some respects unclear, we believe that the facts he gave us were correct, especially his lack of knowledge of the purported sale of the American Family stock to Industries. If he had actually caused or concurred in the purchase of the American Family shares as Henson claims, Long would have certainly remembered that occurrence. We found no evidence of bias against Henson. If either Long or Henson in the name of or on behalf of Industries had made any effort to negotiate for the acquisition of the assets or the stock of either of the Swift Loan Companies, corroborative evidence to that effect would have existed and been offered by petitioner. None was and we draw the appropriate negative inferences therefrom. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). This lack of evidence supports Long's testimony that his own personal financial situation and the general economic conditions in 1974 precluded expansion of the ALCO business. The transaction itself as outlined in the December 11, 1974 letter, even if it had taken place, lacks sufficient economic substance to be recognized for tax purposes unless and until the American Family stock had been pledged to secure a loan in order to acquire the assets or stock of a finance company. However, in this instance there was never any transaction intended; it was simply fabricated by Henson in order to permit Henson to claim a long-term capital loss *324 on his Federal income tax return for the year 1974 which he in fact did. Henson thus filed his Federal income tax return claiming a capital loss deduction based on a fictitious transaction which he had created and well knew he was not entitled to claim. Circumstantial evidence of Henson's fraudulent intent is shown by this record. When his 1974 income tax return was filed, Henson had been a practicing lawyer for approximately 28 years with a sufficient knowledge of tax law to understand the basic requirements of a wash sale. His structuring of a fictitious transaction to claim a loss of almost $178,000 makes fraud self-evident. We recognize that one portion of the purported sale of American Family stock was not fictitious. The stock was actually transferred on the books of American Family to Industries and a new certificate in the name of Industries issued and registered with the registrar. However, "taxation is not so much concerned with the refinements of title as it is with actual command over the property * * *." Corliss v. Bowers,281 U.S. 376, 378 (1930); Frank Lyon Co. v. United States,435 U.S. 561 (1978); Helvering v. Lazarus Co., 308 U.S. 252 (1939); Miller v. Commissioner,68 T.C. 767 (1977). *325 The transferred certificate never left Henson's possession. The fact that American Family may have treated the transfer as valid is immaterial. By reason of his position as general counsel for American Family, Henson was assured of being able to have the transaction effected and recorded on the American Family books while retaining full control over the shares of stock. This tag end part of the purported transaction cannot validate the remainder and does not prevent us from treating it for what it was, a mere sham. By reason of our finding fraud, the statute of limitations has not run for the year 1974. Respondent's determination disallowing the loss on the purported sale of this stock and the addition to tax for fraud under section 6653(b) are sustained for 1974. In 1975, the deficiency is relatively small consisting of several items of omitted income including the American Family dividend. While the American Family stock transaction was in effect completed in 1975 with the retransfer of the stock to Henson, that transaction was not reflected on Henson's 1975 income tax return and cannot be considered as tainting his return for that year. Respondent argues that Henson could not *326 report the American Family dividend because such action would cast doubt upon the validity of the sale. If this were correct, it would buttress respondent's position but we find the argument unpersuasive under the facts here. Respondent's argument is not sufficient to carry his burden of proving fraud by clear and convincing evidence. The omissions from income in 1975 standing alone are insufficient in this case to sustain fraud. We conclude that the year 1975 is barred by the running of the statute of limitations. The transaction in 1976 which allegedly supports the fraud addition is the failure to report the receipt of $42,667 from Gasoil. Respondent contends that this 1976 payment is related to the $75,000 deduction for intangible drilling and development costs taken in 1973 and under the tax benefit rule constitutes ordinary income in 1976. While we tend to believe that the Gasoil transaction whereby petitioner purchased interests in oil and gas leases and wells was incorrectly reported by Henson for Federal income tax purposes with respect to the year 1973, that year is not before us and an error in claiming a deduction in 1973 albeit between the same parties, cannot color *327 an alleged omission of income from a different transaction in 1976. We have found, and respondent does not contend to the contrary, that the conversion in January 1974 of the two $25,000 tentative payments by Henson on his 1973 loans into a loan by Henson to Gasoil was a legitimate transaction, creating an indebtedness of Gasoil to Henson. The $42,667 payments in 1976 on that promissory note were just that. Whether the tax benefit rule serves to convert that receipt of funds into income is a complex Federal income tax question, as our discussion of that issue below indicates. Henson's obligation to report this sum as income was not so clear at the time his 1976 income tax return was filed as to sustain the fraud addition to tax. Respondent has not carried his burden of proof on this issue. Thus, the year 1976 is closed unless open by reason of section 6501(e). For the 6-year statute of limitations to apply pursuant to section 6501(e), the statutory notice must obviously be issued within 6 years from the date the return was filed. However, the running of the statute of limitations may be suspended pursuant to section 7609(e). Insofar as pertinent, this section provides that if *328 a taxpayer whose liability is involved intervenes in a summons enforcement proceeding, "the running of any period of limitations under section 6501 * * * shall be suspended for the period during which a proceeding, and appeals therein, with respect to the enforcement of such summons is pending." Both parties agree that this section of the Code is applicable. The disagreement is with respect to its interpretation. Technically, the enforcement proceeding with respect to the summons issued to the National Bank & Trust Company was pending from March 8, 1979 to May 10, 1979, a period of 63 days. Petitioners argue, however, that both the District Court and the bank were notified within approximately 25 days after March 8, 1979, that petitioners' objection was withdrawn and the bank actually complied with the summons a few days thereafter. If petitioners' argument is sound, the statute of limitations was not suspended under section 7609 for a sufficient period of time to permit the statutory notice to have been issued within the proper period. On the other hand, if respondent's interpretation is correct, than the running of the 6-year statute of limitations was suspended for a sufficient *329 period of time to permit the statutory notice to have been timely. Respondent relies on section 301.7609-5(b), Proced. & Admin. Regs. This provision of the regulations is quoted in full in the margin. [16] *330 The summons enforcement proceeding with respect to the National Bank & Trust Company was clearly pending between March 8, 1979 and May 10, 1979. Under the regulation, the fact of compliance has "no effect on the suspension provisions." Petitioners argue that application of this regulation is unfair or inequitable, but it is an appropriate interpretation of the statute. Certainly we cannot say that the regulation is "plainly inconsistent" with the statute. See Bingler v. Johnson,394 U.S. 741 (1965). We agree with respondent that the statutory notice for the year 1976 was issued within the 6-year period, as extended during the summons enforcement proceedings. The second requirement for section 6501(e) is that the taxpayer must have omitted from gross income "an amount properly includable therein which is in excess of 25 percent of the amount of gross income stated in the return." In order to meet the 25-percent test, respondent must include *331 the sum of $42,667 received by henson in 1976 in gross income. Unless this amount is properly includable in income, the 25-percent test will not be met. As the basis for the inclusion, respondent has cited Hillsboro National Bank v. Commissioner,460 U.S. 370 (1983), and Mayfair Minerals, Inc. v. Commissioner,56 T.C. 82, 89, 90 (1971), affd. per curiam 456 F.2d 622 (5th Cir. 1972). Respondent's theory is that the payment to Henson with respect to the $50,000 note is so related to the 1973 deduction by Henson of $75,000 on account of the Gasoil investment in the dry hole that the tax benefit rule causes what otherwise is simply repayment of a loan to be taxable income. We simply do not agree. The most recent and authoritative formulation of the rule is of course from the Supreme Court's opinion in Hillsboro.
The Government in each case relies solely on the tax benefit rule -- a judicially developed principle that allays some of the inflexibilities of the annual account system. An annual accounting system is a practical necessity if the federal income tax is to produce revenue ascertainable and payable at regular intervals. [Citation omitted.] Nevertheless, strict adherence to *332 an annual accounting system would create transactional inequities. Often an apparently completed transaction will reopen unexpectedly in a subsequent tax year, rendering the initial reporting improper. * * * [460 U.S. at 377.] * * * The basic purpose of the tax benefit rule is to achieve rough transactional parity in tax, * * * and to protect the Government and the taxpayer from the adverse effects of reporting a transaction on the basis of assumptions that an event in a subsequent year proves to have been erroneous. Such an event, unforeseen at the time of an earlier deduction, may in many cases require the application of the tax benefit rule. We do not, however, agree that this consequence invariably follows. Not every unforeseen event will require the taxpayer to report income in the amount of his earlier deduction. On the contrary, the tax benefit rule will "cancel out" an earlier deduction only when a careful examination shows that the later event is indeed fundamentally inconsistent with the premise on which the deduction was initially based. That is, if that event had occurred within the same taxable year, it would have foreclosed the deduction.* * * A court must consider *333 the facts and circumstances of each case in the light of the purpose and function of the provisions granting the deductions. [460 U.S. at 383-385.] When the later event takes place in the context of a nonrecognition provision of the Code, there will be an inherent tension between the tax benefit rule and the nonrecognition provision. [Citations omitted.] We cannot resolve that tension with a blanket rule that the tax benefit rule will always prevail. Instead, we must focus on the particular provisions of the Code at issue in any case. [460 U.S. at 385-386.] [Fn. ref. omitted.] Petitioners' deduction claimed on their 1973 income tax return was presumably claimed under section 263(c), although the return does not so indicate. The deduction is claimed on Form 4797 -- Supplemental Schedule of Gains and Losses in part 2 under the heading "Ordinary Gains and Losses" with the description "Investment in Gasoil Products, Inc. J.M. Burguieres Co. Limited, Well Number 1." Petitioners on brief all but concede that the 1973 deduction was improper or at least excessive but this does not help respondent. The only event which would be "fundamentally inconsistent" with the 1973 deduction of $75,000 *334 was the amendment to the agreement in January 1974, which among other things converted the two $25,000 checks from payments on the 1973 notes into a loan to Gasoil. Repayment of that loan in 1976 had nothing whatsoever to do with the 1973 deduction. If all three events had occurred in the same year, it is not the loan repayment which would be inconsistent with the $75,000 deduction; rather it is the canceling of Henson's obligations and switching of payments into a loan to Gasoil. [17] The repayment of the loan to Gasoil in 1976 is simply too remotely associated with the 1973 deduction to warrant application of the tax benefit rule. Respondent also argues on the strength of Mayfair Minerals v. Commissioner,supra, that the tax benefit rule applies even though the 1973 deduction was erroneous. Our opinion in Mayfair Minerals does not help respondent either. The 1976 treatment of the sum of $42,667 was not inconsistent with *335 the 1973 deduction; rather it was entirely consistent with the 1974 amended agreement. As a consequence, the 25-percent test of section 6501(e) is not met. The other items of omitted income, assuming that the American Family dividends were taxable in full, [18] are not sufficient to meet the 25-percent requirement. Accordingly, the statute of limitations for the year 1976 had run prior to the issuance of the statutory notice. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Respondent has stipulated that the fraud addition does not apply to Mrs. Henson whose interest in this matter is only by reason of having filed joint returns and a joint petition with this Court.↩
3. The investment is reflected in two documents. One document described as an "indenture" transfers a 5-percent interest in three oil and gas leases. This instrument is dated October 23, 1973, but is acknowledged on January 19, 1974. The second "agreement" dated October 23, 1973, recites that a 5-percent "working interest" had been acquired in five wells to be drilled. Various other rights, privileges, and obligations are created by this second instrument. Exact determination of the nature of the interest or interests acquired under the agreements is not important to our decision. Neither is the effective date important.
4. There is nothing in the documents or the testimony explaining why the two December 1973 checks were treated as a loan. We infer, however, that the 1973 agreement was treated as creating an obligation in Gasoil to refund to Henson the sum of $25,000 for the failure to drill well two as well as $75,000, or any part thereof which Henson paid, for failure to drill wells three, four, and five. The basis for his claim on his 1973 income tax return of a $75,000 ordinary loss relating to his Gasoil investment is at best inconsistent with treating the two December 1973 checks as a loan to Gasoil. It is unfortunate that respondent failed to question this 1973 deduction. 5. It is unclear from the January 19, 1974, contract amendment whether the $50,000 is technically a loan or an advance by a principal to an agent.↩
6. It is unclear on this record whether Henson forgave the balance of the $50,000 note or whether he received some consideration in addition to the sum of $42,667. If interest payments received in 1975 and 1976 are applied against principal, Henson's principal balance was only $44,425.24 in January 1976. ↩
7. See n. 5, supra.↩
8. Respondent contends, and petitioners do not deny, that Industries was incorporated on June 7, 1974, the date of an incorporation order of the Superior Court. However, the office of the Secretary of State certified that the incorporation was effective on June 10, 1974. This discrepancy is immaterial.↩
9. There are some other corporate papers included in the record but they are immaterial to these matters.↩
10. Such a sale at that time would have generated a long-term capital loss to Henson of $177,351.48.↩
11. Henson denies receiving this dividend check.↩
12. The timing of this execution by Long is based upon his testimony as well as the independent corroborating circumstantial evidence concerning the formalities of organization of the corporation. ↩
13. We rely upon Long's testimony for this conclusion and decline to accept Henson's testimony that these documents were signed by Long in December 1974.↩
14. The statute of limitations is an affirmative defense, the burden of which is on the party raising it, that is, petitioners. There is, however, no dispute that the statutory notice was issued on August 10, 1983, almost 8 years after the filing of petitioners' 1974 tax return and slightly more than 7 years after the filing of the 1975 tax return. Therefore, the burden of going forward with the evidence would normally have shifted to respondent. However, in this case two of the years are open only if fraud is found and the burden of proof as to fraud is upon respondent.
15. A factfinder may choose to discount a party's self-interested testimony. Christensen v. Commissioner,786 F.2d 1382 (9th Cir. 1986), affg. and remanding T.C. Memo. 1984-197. We so hold notwithstanding Henson's long membership in the bar of the State of Georgia and the reputation testimony by two friends as to his standing in the community. As the transcript shows, Henson's testimony is not convincing. We also observed him closely during the trial and found him lacking in candor. See, e.g., Anderson v. Commissioner,250 F.2d 242↩ (5th Cir. 1957).
16. Sec. 301.7609-5. Suspension of statutes of limitations. (b) Period during which a proceeding, etc., is pending. Under section 7609(e), the statute of limitations may be suspended for the period during which a proceeding, and appeals therein, with respect to the enforcement of such summons is pending. This period begins on the date the action to enforce the summons is commenced, rather than the date a notified person takes any action as provided in section 7609(b). An action to enforce the summons is commenced upon the filing of the petition or complaint to enforce the summons. The period continues until all appeals are disposed of, or until the expiration of the period in which an appeal may be taken or a request for a rehearing may be made. Full compliance, partial compliance, and noncompliance have no effect on the suspension provisions. Of course, if the notified person takes no action provided in subsection (b) of section 7609, no suspension of the statutes of limitations takes place. The periods of limitations which are suspended under section 7609(e) are those which apply to the taxable periods to which the summons relates. The regulation is effective with respect to summonses issued after February 28, 1977.↩
17. Respondent has not argued before us that some amount, such as $50,000, should have been taxable in 1974 under the tax benefit rule. It would be inappropriate for us to raise that issue on our own motion and it is now too late for respondent to change his theory.↩
18. It is possible that the American Family dividends were not taxable in full, a determination yet to be made by respondent.↩