KENNETH M. HENSON AND SUE B. HENSON, Petitioners v. COMMISSIONER of INTERNAL REVENUE, Respondent
Henson v. Commissioner
Docket No. 31654-83.
United States Tax Court
T.C. Memo 1988-275; 1988 Tax Ct. Memo LEXIS 309; 55 T.C.M. (CCH) 1143; T.C.M. (RIA) 88275; June 27, 1988. James C. Fleming and Bryan B. Lavine, for the petitioners. Charles P. Hanfman, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: This cause is before this Court on remand from the Court of Appeals for the Eleventh Circuit following appeal by petitioners from our Memorandum Findings of Fact and Opinion reported at T.C. Memo. 1986-303. [1] In our original opinion we concluded that respondent had sustained his burden of proving, by clear and convincing evidence, that petitioner Kenneth Henson (Henson) had filed his 1974 Federal income tax return with the intent to evade taxes known to be owing. *310 [2] The basis of our decision was respondent' s proof that the purported sale of certain stock in 1974, which is the basis for the loss, did not take place and that petitioner fabricated the sale in order to claim the loss for that year. Whether respondent sustained his burden turned upon our findings as to the facts and circumstances surrounding the alleged sale. Respondent's case rests largely upon the testimony of Albert D. Long (Long), whom Henson alleged authorized the purchase of the stock by a wholly owned corporation, Alco Industries, Inc. (Alco II). [3] Long testified that he did not recall signing documents in December 1974 which effected the sale, and that there was in fact no need for the purchase under the circumstances claimed by petitioner. Henson's testimony was in direct conflict with that of Long. The two key witnesses at trial were thus *311 Henson and Long. We evaluated their testimony in light of the evidence of record and the testimony of the other witnesses and concluded that we believed Long's version of the events that took place: Henson was sufficiently * * * astute to structure and paper a transaction to make it appear real. We simple give no credit to Henson's testimony under oath with respect to this purported sale. Although Long's recollection of these matters was in some respects unclear, we believe that the facts he gave us were correct, especially his lack of knowledge of the purported sale of the American Family stock to Industries. If he had actually caused or concurred in the purchase of the American Family shares as Henson claims, Long would have certainly remembered that occurrence. We found no evidence of bias against Henson. [Fn ref. omitted. Henson v. Commissioner,T.C. Memo. 1986-303, 55 P-H Memo T.C. par. 86,303,51 T.C.M. 1476 (19986).]
We also concluded that, with respect to the purported execution of the documents evidencing the stock sale "we [could] only find that the execution of those documents by Long did not take place in December 1974." Henson v. Commissioner, *312 supra.
The Eleventh Circuit reviewed our findings and directed us to "reconsider the case, viewing Long as a very biased witness and accepting that there is no evidence that the letter and the promissory note [authorizing the sale and evidencing the purchase price] did not exist in 1974." Henson v. Commissioner,835 F.2d 850, 854 (11th Cir. 1988). Based on our review of the record we adopt and incorporate herein the Findings of Fact set forth in our prior opinion, with the exception noted. We find it necessary, however, to add the following additional facts, which we find on this record, that relate to the transaction here involved and to the conduct of Henson and Long generally. ADDITIONAL FINDINGS OF FACT In our original opinion we found facts relating to Long's involvement in ALCO and Alco II and his knowledge (or lack thereof) of the purported purchase of American Family stock by Alco II so its business could be expanded through the acquisition of one or more small loan companies. To these findings we add the following: During 1974 and perhaps prior thereto Long was friendly with one Bynum, the manager of Swift Loan and Finance Company of Columbus, *313 Inc. When control of this company was transferred or sold in the latter part of 1975 to Bynum, Long apparently acquired a stock interest in the company. Also at some point during 1974, Long asked Smith, the second minority shareholder in ALCO, to examine the accounts of Delta Finance Company in order to ascertain whether it might be a satisfactory purchase. He made this request on behalf of Bynum. However, Bynum did not acquire the company or its assets. It is unclear whether Long would have become an investor in Delta if Bynum had acquired that company or its assets. Next, pertaining to Long's involvement as a shareholder in ALCO and Alco II, we add the following: In 1976 Long employed Harry Dicus, a Columbus, Georgia, attorney, to represent him and Alco in connection with proceedings by the Industrial Loan Commissioner of Georgia against them. Dicus also represented Long in connection with Henson's efforts to force ALCO to redeem its debentures which had been acquired by Henson and members of his family. The purchase of Henson's stock interest in ALCO was included in these negotiations. During the course of this employment, Dicus received a proposal or request from an *314 attorney representing Henson that Alco II be turned over to Henson. On inquiry by Dicus of his client, Long advised Dicus that he did not then have and never had had any interest in Alco II. Accordingly, Dicus advised Henson's attorney that Long had no interest in Alco II and the corporate records would be turned over to Henson irrespective of the course of negotiations relative to the ALCO debentures and Henson's stock interest therein. This fact (among others) was also communicated by Dicus to one of respondent's agents by letter dates February 28, 1978. This inquiry made by Dicus of Long took place not later than the year 1977. During 1976 and 1977, for reasons unknown, Henson was concerned that the organization of Alco II be put in proper order. By letter dated March 25, 1976, he requested that Dicus obtain Long's signature on the original stock certificate for the original issue of 1,000 Alco II shares recited by the incorporation papers to have been subscribed for by Long. He also requested that Long sign a promissory note purporting to reflect the $ 1,000 subscription price for the original 1,000 shares. In that connection he offered to indemnify Long against any effort *315 to enforce the note. The note is dated April 15, 1974. Other than the recital in Henson's March 1976 transmittal letter, there is no evidence that Long's subscription price was intended to be paid by a note. [4] Long signed the stock certificate as requested, but on the advice of Dicus, refused to sign the promissory note. Long also agreed to pay a small portion of a bill submitted by Henson to Long through Dicus for the organization and dissolution of Alco II. [5]
To our findings pertaining to the purported sale of American Family stock, we add: American Family was organized in 1955, with Henson being one of the original incorporators. He commenced accumulating stock in the company from its incorporation. A former partner of Henson, Ed Kelly, was general counsel for American Family from its incorporation to some date in 1971 when Henson *316 succeeded Kelly as general counsel. Henson and Kelly were partners for approximately 18 years, the partnership apparently terminating in 1971 when Kelly was forced to resign from American Family's board. It is logical to assume that during the period of Henson's partnership with Kelly, Henson did some legal work for American Family. In any event in 1971 Henson was sufficiently well known by the American Family officers as to be invited to become a member of its board of directors. Prior to the economic downturn in 1974-1975, Henson was engaged at least in part in real estate practice. Four of the most critical documents in this case are (i) a letter from Henson to Long as president of Alco II dated December 11, 1974, outlining the proposed sale to Alco II by Henson of 39,276 shares of American Family stock, (ii) an unsecured promissory note of the same date by Alco II to Henson for the purchase price of that stock in the amount of $ 157,104, (iii) a letter from Henson to Long dated February 22, 1975, providing for the repurchase by Henson of that stock by cancellation of the note, and (iv) the printed stock power used to retransfer these shares from Alco II to Henson on American *317 Family's books. The stock power is signed by Long as president of Alco II and witnessed by Henson's secretary, Kathy Martin. It is attached to certificate number C-01716 issued on December 17, 1974, in the name of Alco II. [6]
The letters of December 11, 1974, and February 22, 1975, were typed by Ms. Martin on the dates shown on each letter and the originals were delivered by her to Henson. She has no knowledge as to when and where these documents were signed. Ms. Martin also prepared the several stock powers used for this transaction, including the stock power attached to certificate number C-01716. Ms. Martin signed this stock power as a witness to Long's signature, but Ms. Martin has no recollection as to the time or place where either signature was affixed, except that she has never been in ALCO's office. The American Family stock certificate C-01716, after it had been issued and registered by Columbus Bank and Trust Company on December 18, 1974, was at Henson's express request to Ms. Frances B. King, vice president in charge of the stock transfer department of American Family, delivered *318 by courier to Henson at his office. It was the normal practice of American Family to deliver a reissued certificate to the person who brought the certificate to be canceled into the stock transfer department for reissuance. Thus, even without Henson's request, the certificate would have been redelivered to him after reissuance in December 1974. The certificate never left Henson's custody and possession until it was redelivered to American Family in May 1975 for retransfer into Henson's name. Neither Long nor any person authorized by Long to accept possession of this certificate ever saw the certificate. In 1975, prior to reissuance of the American Family shares into Henson's name, American Family declared and paid a dividend in the amount of $ 2,356.60 to Alco II, sending the check to ALCO's address. Henson informed Long that this dividend belonged to him and Long accordingly endorsed the check in blank and delivered it to Henson. Henson at that time told Long something to the effect that he intended to cheat on his taxes. Henson reported the loss on the sale of the American Family stock on his 1974 return. The return was initially audited by Monty Murphy, one of respondent's *319 then revenue agents. [7] To support the loss shown on the return, Henson prepared or caused Ms. Martin to prepare a schedule reflecting his purchases of shares of American Family stock aggregating the 39,276 shares purportedly sold to Alco II. Whether the tax return preparer was shown this schedule is not clear, but the facts as to the purported sale, including the cost basis of the shares and the sale price, were provided to the preparer by Henson or by Ms. Martin at his direction. And finally we make the following findings relating to Henson's conduct in 1974 as it related to his investment in Gasoil: The only money transferred by Henson to Gasoil in connection with the October 30, 1973, well drilling agreement was the original $ 25,000 cash investment. All other amounts transferred between these parties related to the $ 50,000 loan made by Henson pursuant to the revised January 19, 1974, agreement. The revised January 19, 1974, Gasoil *320 agreement contains a confirmation of Henson's entitlement to a "$ 75,000 intangible tax deduction" based on the dry hole. It also includes an indemnity against disallowance of this deduction by the Internal Revenue Service, which indemnity was joined in by Fullington and White as Gasoil stockholders. Petitioners' 1973 Federal income tax return was timely filed [8] in September 1974, after the $ 50,000 transferred between the parties had been restructured as a loan. The incorporation of the indemnity provision in the January 19, 1974, agreement reflects Henson's concern that he might not be entitled to the full $ 75,000 deduction. On petitioners' 1973 return, Henson claimed a net loss in the amount of $ 75,000, which was explained on Form 4797 attached to the return as "Investment in Gas Oil Products, Inc. J. M. Burquieres Co., Ltd. Well #1," with a cost to petitioners in the amount of $ 75,000. DISCUSSION The threshold issue in our reconsideration of this case in light of the directions of the Court of Appeals is the credibility of the witnesses, particularly Henson and Long. CREDIBILITY OF *321 WITNESSES The Court of Appeals has focused upon the following sentence in our opinion referring to Long. We said: "We found no evidence of bias against Henson." The word "bias" in that context was misleading to the Court of Appeals and therefore an unfortunate use of that word. We intended that statement to reflect our assessment of Long as a witness in the case. It was a short hand way of stating that, irrespective of the controversy and bad feelings between Long and Henson, Long was in our judgment a truthful witness. After a careful review of the record we again reach the same conclusion. Although Long had reason to be biased, we still believe his testimony was truthful and credible. The Court of Appeals recognizes that a trial judge "may in certain circumstances believe some or all of the testimony of a biased witness." 835 F.2d at 853. During the trial and in reaching our opinion in this case we exercised our judgment as the trier of fact. We judged the credibility of each witness in turn, especially Long and Henson. We have now reviewed this record and confirm our judgments as to Long and Henson. In this respect we note that all of the witnesses, except *322 Henson, were excluded from the courtroom pursuant to Rule 145. Henson was the first witness. Thus, when each witness testified, that witness did not know what any other witness had said during the course of the trial. During the trial we were made aware of the existence of controversy between Henson and Long by the interrogation of each of these individuals. We understood that the stockholders' derivative suit filed against ALCO and Long on behalf of members of Henson's family in the spring of 1978 charged Long with mismanagement of ALCO. This suit followed a suit filed in 1977 seeking to force ALCO to redeem debentures issued to members of the Henson family. We knew that we would be required to form a judgment as to Long's credibility, including the difficult task of discerning whether his testimony was colored at all by ill will toward Henson. For this reason we observed the demeanor of Long when testifying with extra care. We listened to his tone of voice; we observed the expressions on his face and his manner used in responding to questions. We even recalled Long towards the end of the trial in order to interrogate his specifically as to several of the critical documents. *323 At that time we reminded him of the importance of his testimony and received his assurance that he was giving us his best recollection. Long, in our judgment, fully recognized the delicacy of his position as a key witness and made a conscientious effort to give an accurate account of relevant facts. Our review of the testimony and evidence during the drafting of our opinion confirmed our conclusions made during the trial. These conclusions have been reconfirmed by our review of the record pursuant to the mandate of the Court of Appeals. We remain convinced that Long was testifying correctly to the best of his recollections, and that Long's testimony was not colored against or for Henson by the controversy with Henson. The Court of Appeals comments that Long assisted respondent in the reaudit of Henson. We assume that conclusion is based upon Smith's testimony; there is no other evidence in the record and that testimony we regarded as inconclusive. But even if Long had been the first to advise a revenue agent of Henson's statement in 1975 that he, Henson, was going to try to get away with something for tax purposes, [9] in our courtroom Long did not allow his dislike for Henson *324 to influence his testimony. For example, to the extent disclosed by this record, Long's statements to revenue agent Beasley were not materially different from his testimony in our Court. At least one interview with Beasley occurred in 1977, before Henson charged Long with mismanagement of ALCO. Further confirmation of Long's testimony lies in statements made to his attorney, Harry Dicus, to the effect that he had never had any interest in Alco II. Dicus then advised Henson's attorney that Henson could have Alco II, irrespective of settlement of the debenture matter. This does not reflect the attitude of a vindicative man. Our evaluation of Henson as a witness is entirely different. On many occasions, as the record at places reflects, Henson's answers to questions of respondent's counsel were halting. Frequently, he groped for time by repeating the question. His recollection about the American Family sale, as contrasted with his recollection of the Gasoil facts, was at times sketchy. His answers frequently showed traces of irritation. Moreover, Henson's demeanor as a witness with respect to *325 the stock sale contrasted sharply with his demeanor when discussing Gasoil. And while Henson in his testimony sought to convey the impression that Long was the actor, the instigator, the leader in the proposed expansion of ALCO, we find that to be out of character for both Long and Henson. Moreover, Henson's description of the purported sale transaction runs counter to common sense. This is particularly so for an experienced and successful lawyer with corporate and financing experience, accustomed to investing in securities and with an intimate knowledge of the small loan business. There was no need to sell the American Family shares to Alco II in order for Long to commence negotiations for the purchase of either or both of the Swift companies. As Henson himself testified, ALCO itself could have provided the necessary credit. If further evidence of financial backing were required, Henson's willingness to transfer the American Family shares, demonstrated by a letter similar to the December 11, 1974, letter agreement, would have sufficed as a basis upon which to open negotiations with one or both of the Swift companies. We cannot and do not believe that Henson would have transferred *326 to Long unnecessarily ownership of $ 150,000 worth of American Family stock in return for the unsecured promissory note of a shell corporation. Henson had been accumulating stock of American Family for many years and in fact in 1974 tried to persuade the principals of Gasoil to repay part of its indebtedness to him in order to use the money to acquire additional shares of American Family in the then depressed market. His attitude toward investment in American Family may well have accounted for his apparent unwillingness to sell this stock on the open market so as to realize a legitimate tax loss. It is at least hypothetically possible that Henson could have persuaded Long to cause ALCO or Alco II to enter into this highly conditional purchase in order for Henson to realize his tax loss and then to negotiate for acquisition of the Swift companies. But we believe that had this happened, Henson would have made sure that such negotiations took place. Evidence confirming such facts would have been introduced at the trial, but there was none. Henson would not, in our judgment, transfer more than $ 150,000 in securities to Long in return for an unsecured worthless promissory note in *327 order to permit Long to open negotiations, and then fail to follow up with Long for more than 2 months, as Henson testified. Such conduct was, in our judgment, uncharacteristic of the successful and experienced lawyer which Henson was and is. Using the same tests we applied to Long, we found, and still find, that Henson was not testifying truthfully as to the alleged sale to Alco II. There was too much insecurity in his demeanor on the witness stand on this issue for us to credit his testimony. We were also aware of possible bias in favor of Henson on the part of his secretary, Kathy Martin, and Frances B. King, the vice president in charge of stock transfers for American Family. Ms. King explained that she knew "Kenneth [Henson] as being a legal counsel for the corporation and a friend." (Emphasis supplied.) The testimony of these two witnesses was significant on the stock sale issue. The recollection of Kathy Martin with respect to the stock power used to retransfer American Family stock certificate number C-01716 into Henson's name was singularly inconsistent with the clarity of her recollection of the dates of typing the December 11, 1974, and the February 22, 19775, letters. *328 In spite of the span of years, the circumstances of her typing these two documents was vivid. But the circumstances of the stock power which she both typed and witnessed were beyond her recall. We sensed that the existence of her signature as a witness to Long's signature on that document made it necessary for her to have a convenient gap in her memory. It is in light of these determinations as to the credibility of each of the witnesses that we have reconsidered the evidence in this case. DOCUMENTS EVIDENCING SALE The Court of Appeals in its remand states "that there is no evidence that the letter and the promissory note did not exist in 1974." [10]835 F.2d at 854. However, such a finding could only be correct if we completely disregarded Long's testimony, which was contrary to Henson's. We have, pursuant to the direction of the Court of Appeals, reevaluated Long as a biased witness. However we have concluded, as we did before, that his testimony is credible. It is his testimony that creates the inference that the documents were not signed. Long testified consistently that he signed Alco II documents (other than those signed in Dicus' office in 1977) on *329 only two occasions, both times in the law office of Henson. The first occasion had to be in late May or early June 1974 since the incorporation papers with Long's signature thereon were filed with the office of the secretary of state on or prior to June 10, 1974. The second occasion for document execution according to Long was probably in the spring of 1975. It was only as a result of interrogation by the Court on recall of Long that he finally conceded that the December 11, 1974, letter could have been signed in December. His answer to our question was "Possibly, it may have, sir. I will not say definitely. I don't remember the exact date." This speculation on Long's part as to the execution date did not alter his basic testimony that all of the document executions in 1974 and 1975 had taken place in the Henson law offices. It is only Henson who testified that the December 11, 1974, letter and promissory note were taken by him to Long's offices *330 for signature. There was no explanation by Henson for this unusual occurrence -- the delivery of a document by him to Long's office -- and no interrogation of Long as to a possible conference in ALCO's offices. [11] Such an occurrence would have focused Long's attention on the contents of the two documents, the letter and note. We are convinced that he would have recalled the circumstances and that there would have been conversation about the proposed negotiations. On the basis of Long's testimony and our conclusion that Henson would have obtained the signed stock power from Long before execution of the December 11, 1974, letter agreement, we are convinced that the December and February documents were all executed on the same occasion. Ms. Martin's testimony as to the date of typing the February 22, 1975, letter contradicts a December 1974 execution date for the December 11 letter and note. We strongly suspect that this stock power was prepared by Ms. Martin in December 1974 when the other powers were typed. However, we simply do not believe *331 that there was any meeting or document signing in Long's office in December 1974. ASSUMPTION WITH RESPECT TO THE 1974 LETTER AND NOTE Even were we to find that these two 1974 documents were actually and knowingly signed in December 1974, as the Court of Appeals apparently assumes, we remain convinced that the alleged sale to Alco II was known by Henson to be an incomplete transfer under Georgia law and therefore ineffective for Federal tax purposes. Henson testified that he never saw the stock certificate issued in the name of Alco II until it was returned to him by Long in Februar 1975. Although it is possible that Henson never actually looked at the stock certificate after it had been returned to his office by the American Family courier, on this record we have no doubt that the reissued certificate remained in Henson's office, in his custody and under his sole control until it was returned to American Family for cancellation and reissue in May 1975. The testimony of Mrs. King is convincing while Henson's own statements on this point are highly qualified. [12]
*332 We find it to be inconceivable that in 1974 Henson was unaware of the significance of delivery of a stock certificate to a purchaser -- that transfer of shares of stock was not recognized under George law until delivery had been made. [13]Henson had been general counsel for American Family since 1971 and presumably had been doing some of that corporation's legal work prior to that time since one of his former partners had been general counsel and a member of its Board of Directors. Prior to 1971 Henson was well known to American Family. *333 Furthermore, while Henson may not have been an expert tax lawyer in 1974 or in 1975 when his Federal income tax return for the year 1974 was filed, his experiences in trading in securities for his own account, as a Georgia lawyer at that time for almost 25 years with a broad gauge practice and as general counsel of and knowledgeable about American Family and its problems, including those of the stock transfer department, made him aware that in order to realize a tax loss a completed sale of the American Family stock would have to be made. On this hypothesis, Henson's actions in executing the December 11 letter and note, but retaining possession of the reissued stock certificate, followed by the representation to his tax return preparer that the stock had been sold, are compelling evidence of his intent to defraud the Federal Government. Similarly, his false representation of the fact of sale to agent Murphy was a bade of fraud. Thus even discounting the testimony of Long and accepting that there is no evidence that the letter and promissory note were not executed in 1974, we, nevertheless, conclude that respondent has carried his burden of showing by clear and convincing evidence *334 that Henson, in the filing of his 1974 Federal income tax return, intended to evade taxes known to be owing by conduct intended to conceal, mislead, and otherwise prevent the collection of taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner,80 T.C. 1111 (1983). On our reexamination of this record, we have found no corroboration for Henson's story of the sale of American Family stock to Alco II in December 1974, other than the series of documents drafted by Henson. Having found that Henson testified falsely as to this sale, the mere existence of these fully executed documents proves nothing. There was no completed and effective sale for tax purposes, which Henson well knew. We reaffirm the holding of our original opinion that respondent's determination of the addition to tax for fraud for 1974 is sustained. THE GASOIL TRANSACTION We further regretfully find that Henson's conduct in 1974 and 1975 vis a vis his Federal tax obligations seems to reflect a pattern of claiming false deductions. By early January 1974, Henson knew that his investment in Gasoil was to be only his initial $ 25,000 payment. *335 He was expressly relieved of all liability for both the $ 25,000 note due on December 30, 1973, and the $ 75,000 note due in January 1974. The two checks, each in the amount of $ 25,000, issued by him during the month of December were converted into a loan by him to Gasoil. It does not take a person with sophistication in Federal tax matters to realize that a $ 25,000 payment to be used for well drilling costs cannot be inflated into a $ 75,000 deduction by reason of the provisions of a superceded agreement. His counsel on brief conceded that his claiming this deduction on his 1973 tax return filed in September 1974, after petitioner knew he had only invested $ 25,000, was questionable. The claimed deduction was without basis in fact or law and we believe Henson knew it. Such conduct creates further doubt as to his good faith intentions in 1974 to observe the provisions of the Internal Revenue Code. For the foregoing reasons we confirm our conclusion that respondent's determination of fraud for Henson's 1974 tax year is sustained. Decision will be entered under Rule 155.
Footnotes
1. 835 F.2d 850↩ (11th Cir. 1988). 2. This is one of several issues decided in our opinion but the only issue to which the remand applies. ↩
3. In our opinion we referred to Alco Industries, Inc. as "Industries." We now use the designation "Alco II" in conformity to the opinion of the Court of Appeals. ↩
4. We doubt that this particular note was drafted by Stapleton, who drafted most of the incorporation papers. ↩
5. For reasons not explained on this record, the payment of a fee of $ 229.90 was arranged by means of a check payable to Henson or to his law firm in the amount of $ 1,000 of which $ 770.10 was rebated by Henson to Long. ↩
6. The cancelled certificate is in the stock record files of American Family. ↩
7. Murphy's initial contact appears to have been with the certified public accountant who had prepared the return. However, Murphy's work papers appear to indicate that Henson dealt with him personally but we cannot find that as a fact. ↩
8. The return was timely due to extensions of time granted by respondent. ↩
9. We have made an additional finding that his conversation took place. ↩
10. We infer that in its use of the word "exist" the Court of Appeals is referring to the letter and note as fully executed documents. We have accepted Ms. Martin's testimony as to the dates on which the documents were typed. ↩
11. We note that all of the other meetings of Henson and Long apparently took place in neutral surroundings or in Henson's law offices. ↩
12. Henson testified as to the loaction of the transferred certificate as follows: A. I didn't do anything with it. It wouldn't have come to me. It would have gone to Alco Industries. Q. You're saying you did not receive the certificate to Alco Industries? A. I have no knowledge of having received -- the only time I have knowledge of receiving the certificate from Alco Industries is when Al Long brought it to my office. Q. You did not see a certificate until Mr. Long brought it to your office? A. I have no knowledge of having seen the certificate until Al Long brought it to my office. Q. But you didn't give the certificate to Mr. Long, to he best of your knowledge? A. No. The address of Alco Industries was 1700 -- well, I don't know -- whatever -- First Avenue. ↩
13. Under the Uniform Commercial Code as in effect in Georgia in 1974, delivery of a security is essential to effect a completed transfer of ownership. Delivery is the final or definitive act which completes transfer. It ocurs when the purchaser or a person designated by him acquires possession of the security. Official Code of Georgia Annotated secs. 11-8-3099, 313 (1982); 15A Am. Jur. 2d Commercial Code, secs. 101, 104↩ (1976). Mere endorsement of a security whether on the security itself or on a separate stock power does not constitute a transfer until the security, together with the separate stock power, has been delivered. Thus under Georgia law the issuance of the American Family shares in the name of Alco II with the delivery of that certificate to Henson did not constitute a transfer to Alco II. There is no evidence in this record that Long or Alco II authorized Henson to accept delivery for it; no such claim can in fact be made by petitioners since Henson disclaimed having custody or possession of the stock certificate.